489 P.3d 728
Furmen Lee LEYBA, Petitioner
v.The PEOPLE of the State of Colorado, Respondent
Supreme Court Case No. 19SC806 Supreme Court of Colorado.
June 21, 2021
Attorneys for Petitioner: Megan A. Ring, Public Defender, Alan Kratz, Deputy Public Defender, Denver, Colorado
Attorneys for Respondent: Philip J. Weiser, Attorney General, Melissa D. Allen, Senior Assistant Attorney General, Denver, Colorado
En Banc
CHIEF JUSTICE BOATRIGHT delivered the Opinion of the Court.
¶1 After Furmen Leyba invoked his right to counsel during a custodial interrogation, he continued talking. Leyba then signed a form waiving his rights under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and subsequently spoke with detectives about the incident in question for approximately two hours. Before trial, Leyba moved to suppress his statements from the interrogation, arguing that the detectives failed to honor his invocation of the right to counsel. The trial court denied the motion to suppress, and Leyba's statements were used at trial. The court of appeals affirmed, concluding that, although Leyba initially invoked his right to counsel, the detectives properly ceased the interrogation and Leyba then reinitiated communications, meaning he revoked his previous request for counsel. We now affirm. ¶2 We hold that once a suspect invokes his right to counsel and police stop the interrogation, no minimum amount of time must pass before he may validly reinitiate discussion of the investigation. Here, we conclude that, although Leyba initially invoked his right to counsel and police ceased the interrogation, Leyba immediately reinitiated communications, thereby revoking his previous request for counsel.
I. Facts and Procedural History
¶3 Leyba and his acquaintance, Gabriel Flores, went to a house wherein Flores fatally shot an adult male and two juveniles. Leyba and Flores then left the house, taking guns, a toolbox, and a box thought to contain money. After realizing the box did not contain money, Leyba and Flores returned. Flores threatened the homeowner with a gun, demanding money and drugs. But once Leyba and Flores learned that police were on their way, they left again. They were later arrested separately.
¶4 After Leyba was arrested, Detectives Morgen and Overton interrogated him for approximately two hours. At the beginning of this interrogation, Detective Morgen asked Leyba for general information, such as the spelling of his name. Then, Detective Morgen transitioned to discussing an advisement of rights, and the following exchange occurred:
Detective Morgen: We want to go through your advisement of rights. I would like you to come over here and look at this [ Miranda waiver form] if you're willing?
Leyba: Do I need my lawyer for this?
Detective Morgen: Are you asking for one or not?
Leyba: Yeah.
Detective Morgen: Okay.
Leyba then immediately continued talking:
Leyba: I don't know what you [inaudible] are doing, like you're just asking me a bunch of questions about my name and stuff; I haven't been told shit besides what I been seeing on the news and I don't know what the fuck you're talking about.
Detective Morgen: K, we're investigating a homicide that took place two days ago. Leyba: I know all that, I mean, I mean, obviously I was around the same crowd of people and all that so, I mean, but the person you guys already caught hasn't told you what you guys needed to know? Why does everybody else keep putting people involved that didn't do shit. There was more than just me there. [Inaudible] been the only one that's sitting on me like a suspect or something, I didn't do shit wrong.
Detective Morgen: So, I'll make this clear, are you willing to talk to me or go through this form and talk to me about this case or no?
Leyba: And I can ask for a lawyer anytime I start to feel uncomfortable?
Detective Morgen: Yes, sir.
Leyba: All right.
¶5 Detective Morgen then walked Leyba through a form advising him of his Miranda rights. Leyba signed the form, waiving those rights. While signing the form, Leyba noted that he was "stressed out," but he made no request to stop the questioning or to speak with a lawyer during the remainder of the interrogation.
¶6 The People subsequently charged Leyba with three counts of felony murder, three counts of aggravated robbery, three counts of accessory to first-degree murder, and one count of accessory to commit aggravated robbery. Before trial, Leyba moved to suppress the statements he made during the interview, arguing that they were obtained in violation of Miranda. The trial court denied the motion, concluding that Leyba did not unequivocally invoke his right to counsel. Therefore, the recording of the interrogation was used at trial. The jury ultimately acquitted Leyba of felony murder but found him guilty of one count of aggravated robbery and three counts of accessory to first-degree murder. Leyba appealed, arguing (as relevant here) that the trial court erred in denying his motion to suppress the statements from the interview.
¶7 A unanimous division of the court of appeals affirmed, albeit on different grounds than the trial court. People v. Leyba, 2019 COA 144, ––– P.3d ––––. The division concluded that initially, Leyba unambiguously invoked his right to counsel when Detective Morgen inquired if he was asking for a lawyer, and he responded, "Yeah." Id. at ¶¶ 21-24. But the division held that Leyba then revoked his request for counsel when he immediately reinitiated discussion about the investigation. Id. at ¶¶ 38-40.
¶8 The division rejected Leyba's argument that, under People v. Bradshaw, 156 P.3d 452 (Colo. 2007), and People v. Redgebol, 184 P.3d 86 (Colo. 2008), he could not have reinitiated because "his questions and statements occurred so soon after he invoked his right to counsel," Leyba, ¶ 31. The division found Bradshaw distinguishable because the officer in that case did not stop the interrogation but instead asked the suspect a substantive question that was likely to elicit an incriminating response. Id. at ¶ 32 (citing Bradshaw, 156 P.3d at 459 ). As to Redgebol , the division recognized that the suspect in that case spoke very little English but invoked his right to counsel before quickly changing his mind and agreeing to discuss the incident at issue. See id. at ¶ 33 (citing Redgebol, 184 P.3d at 98-99 ). The division acknowledged the court's ultimate holding in Redgebol : that the suspect did not knowingly and intelligently waive his rights. Id. But on the issue of reinitiation, the division noted that the Redgebol outcome "rested ... on the detective's failure to stop interrogating the defendant." Id. at ¶ 34. Therefore, although the division recognized Redgebol's discussion regarding the timing of invocation and reinitiation—which noted that any potential reinitiation would have occurred "less than a minute" after invocation—it did not read Redgebol "as creating a bright-line durational minimum before which a defendant cannot reinitiate the conversation." Id. at ¶ 33. Ultimately, the division held that, while timing is a relevant consideration in deciding whether a suspect reinitiated, it is not dispositive. Id. at ¶ 34.
¶9 We granted certiorari and now affirm.1 II. Analysis
¶10 We begin by outlining the appropriate standard of review. Next, we discuss the law relating to the Fifth Amendment right to counsel. Specifically, we explain what constitutes reinitiation after a suspect invokes his right to counsel. Then, we hold that once a suspect invokes his right to counsel and police stop the interrogation, no minimum amount of time must pass before he may validly reinitiate discussion of the investigation. Applying that holding to the facts here, we conclude that Leyba's statements were properly admitted at trial. Therefore, we affirm the judgment of the court of appeals.
A. Standard of Review ¶11 A trial court's suppression ruling presents a mixed question of law and fact. People v. Kutlak, 2016 CO 1, ¶ 13, 364 P.3d 199, 203. We defer to a trial court's findings of fact where sufficient evidence exists in the record to support those findings. Id. But we review the legal effect of facts de novo. Id. Furthermore, "where the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed." People v. Madrid, 179 P.3d 1010, 1014 (Colo. 2008). In such cases—and this is such a case—we may independently review the audio or video recording to determine whether the statements were properly admitted in light of the controlling law. Kutlak, ¶ 13, 364 P.3d at 203.
B. Fifth Amendment Right to Counsel ¶12 The Fifth Amendment to the United States Constitution guarantees the right to counsel during a custodial interrogation. Miranda , 384 U.S. at 469, 86 S.Ct. 1602 ; see also Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In Edwards , the U.S. Supreme Court held that when a suspect invokes the right to counsel, interrogation must cease until counsel is made available or the suspect voluntarily reinitiates communications with police and knowingly and intelligently waives his rights. 451 U.S. at 483-85, 101 S.Ct. 1880. This framework consists of two primary inquiries: whether the suspect unambiguously invoked the right to counsel, and if so, whether the suspect reinitiated communications with the police and "knowingly and intelligently" waived his previously invoked right. Kutlak, ¶ 9, 364 P.3d at 202. At each stage of this analysis, we consider the totality of the circumstances. Id. at ¶ 24, 364 P.3d at 206 (whether a request for counsel is ambiguous); Redgebol, 184 P.3d at 99 (whether a suspect reinitiates communications). ¶13 To invoke the right to counsel, a suspect's request must be sufficiently clear such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ; see also Kutlak, ¶ 3, 364 P.3d at 201. In determining whether a request was unambiguous, a court should focus on the request itself because "an accused's postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." People v. Kleber , 859 P.2d 1361, 1364 (Colo. 1993) (quoting Smith v. Illinois, 469 U.S. 91, 100, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) ). ¶14 Upon clear invocation of the right to counsel, police must honor a suspect's request by stopping the interrogation. Miranda, 384 U.S. at 473-74, 86 S.Ct. 1602 ; Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880 ; Bradshaw, 156 P.3d at 456. This bright-line rule exists to "prevent police from badgering a defendant into waiving his previously asserted right to counsel." Kutlak, ¶ 14, 364 P.3d at 204 (citing Davis, 512 U.S. at 458, 114 S.Ct. 2350 ). ¶15 Once police cease interrogation upon a suspect's invocation of the right to counsel, a suspect may nonetheless subject himself to additional interrogation by "initiat[ing] further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880. For a suspect to reinitiate questioning, his comments must " ‘evince[ ] a willingness and a desire for a generalized discussion about the investigation,’ and not merely question the reasons for custody." People v. Martinez, 789 P.2d 420, 422 (Colo. 1990) (plurality opinion) (alteration in original) (quoting Oregon v. Bradshaw, 462 U.S. 1039, 1045-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (noting that "routine incidents of the custodial relationship," such as a request to use a telephone, do not constitute reinitiation of communications)). Therefore, if the "suspect himself initiates dialogue with the authorities," he may revoke his previous request for counsel. Oregon v. Bradshaw, 462 U.S. at 1044-46, 103 S.Ct. 2830 (quoting Wyrick v. Fields, 459 U.S. 42, 46, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam)).2 ¶16 With these principles in mind, we turn to the facts of this case.
C. Application ¶17 The parties do not dispute that Leyba unambiguously invoked his right to counsel in the first instance. Therefore, considering the totality of the circumstances, we focus our analysis on whether Leyba reinitiated communications with the police.
¶18 Once Leyba invoked his right to counsel, Detective Morgen simply said "Okay." But Leyba immediately continued talking, stating that he had not been given any information and did not know what the detectives were talking about. Detective Morgen responded, "K, we're investigating a homicide that took place two days ago." Again, Leyba immediately continued talking, without allowing for any pause in the conversation.
¶19 At this point, Leyba commented on the events in question: "[t]here was more than just me there," "obviously I was around the same crowd of people and all that," and "the person you guys already caught hasn't told you what you guys needed to know?" These statements by Leyba came without any prompting from the detectives, and they go beyond mere administrative requests that are "routine incidents of the custodial relationship," Oregon v. Bradshaw , 462 U.S. at 1045, 103 S.Ct. 2830 ; instead, Leyba's comments demonstrated a willingness to talk about the night in question, his association with others involved, and the scope of the investigation up to that point, see id. at 1045-46, 103 S.Ct. 2830 (holding that the defendant's question, "Well, what is going to happen to me now?," evinced a willingness and desire for a generalized discussion about the investigation). Indeed, it seems Detective Morgen perceived Leyba's remarks as evincing a willingness to discuss the events in question, as he attempted to clarify what Leyba wanted to do: "So, I'll make this clear, are you willing to talk to me or go through this form and talk to me about this case or no?" In response, Leyba agreed to talk, and he confirmed his understanding of his right to ask for a lawyer at any point in the discussion if he felt uncomfortable. Accordingly, we conclude that the substance of Leyba's remarks demonstrate a willingness for generalized discussion about the investigation. See id.
¶20 Leyba nevertheless argues that, per Bradshaw and Redgebol , he could not have reinitiated communications because his statements came so soon after his invocation of the right to counsel. We disagree.
¶21 In Bradshaw , the suspect—who was accused of sexual assault—invoked his right to counsel during an interrogation, but the detective subsequently asked him, "So, are you, are you telling me that this was consensual?" 156 P.3d at 454. Bradshaw responded, "Yes it was." Id. The detective then asked whether Bradshaw wanted to continue talking to him or if he wanted a lawyer, and Bradshaw responded, "Well, I want to know what I'm facing here." Id. After a brief exchange regarding the class of felony at issue, the detective again asked Bradshaw if he wanted to continue talking, and Bradshaw responded, "Yeah, I'll talk to you." Id. at 455. We rejected the People's argument that Bradshaw reinitiated the interrogation, concluding instead that he could not have reinitiated because the detective never stopped questioning. Id. at 456 ("[The detective] never ceased the interrogation; hence [the suspect] could not reinitiate it."). But—contrary to Leyba's characterization of Bradshaw —we did not hold that the short period of time between the suspect's invocation and subsequent statements precluded him from reinitiating. That is, it was the interrogative nature of the detective's response, not the timing of the suspect's invocation and reinitiation, that controlled the outcome in that case.
¶22 Here, Detective Morgen's responses were not interrogative. After Detective Morgen directed Leyba's attention to a Miranda waiver form, Leyba responded, "Do I need my lawyer for this?" Detective Morgen clarified, "Are you asking for one or not?" To this, Leyba responded, "Yeah." Importantly, after this request for counsel, Detective Morgen simply said "Okay." Leyba then commented that he did not understand why the police were questioning him. Detective Morgen truthfully and concisely responded, "K, we're investigating a homicide that took place two days ago." Detective Morgen's statements—"Okay" and "K, we're investigating a homicide that took place two days ago"—were direct responses to Leyba's comments, not inquisitive remarks. Unlike the detective in Bradshaw , Detective Morgen had no reason to believe his statements were "reasonably likely to elicit an incriminating response." See Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (explaining that interrogation consists of "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"). In other words, Detective Morgen ceased the interrogation when he responded "Okay" to Leyba's request for a lawyer. Therefore, Bradshaw is distinguishable.
¶23 We similarly reject Leyba's argument that Redgebol requires a certain amount of time to pass between a suspect's invocation of the right to counsel and their subsequent reinitiation of communications. The suspect in Redgebol was an immigrant from Sudan who had an interpreter translate the interrogation to his native language, Dinka. 184 P.3d at 88. Both the suspect and the translator were unfamiliar with the legal system, and the translator often relayed a rough translation because the Dinka language did not translate literally to English, let alone encompass "abstract ideas that form the basis of our Miranda rights." Id. at 91, 98. At one point during the interrogation, the suspect said he wanted a lawyer, and the detective responded: "He would like a lawyer? Okay. ... Then I will stop. I forgot to say what time it was when we started this. We began this tape around 5:10 pm on June 23, 2004, and [the suspect] has just indicated that he would like a lawyer before any questioning." Id. at 90. The suspect then responded that he did not understand, and asked, "Will you be questioning me, then after you go, the lawyer comes?" Id. When the detective clarified that the conversation would not continue until a lawyer was appointed, the suspect said the detective could continue questioning without a lawyer. Id.
¶24 We ultimately concluded that the suspect's waiver of his Miranda rights was not knowing and intelligent because there was a complete lack of understanding—linguistically and substantively—between the officer, the translator, and the suspect. Id. at 95-98. But we then went on to analyze whether the suspect reinitiated questioning. Id. at 99-100. We commented on the lack of case law where a defendant invoked his right to counsel and then reinitiated questioning "in less than a minute"; we noted that Bradshaw "controls in the situation where the officer does not end the interrogation after a suspect requests counsel"; and we concluded that the trial court was "within its discretion to determine that a thirty-second pause did not constitute the cessation of interrogation by the police and its voluntary resumption by [the suspect]." Id.3 But we did not create a bright-line rule that any specific amount of time must pass before a suspect may validly reinitiate discussions with police.4 ¶25 To be clear, neither Bradshaw nor Redgebol created a dispositive timing requirement for reinitiating an interrogation. And while timing is a factor to consider in determining whether a suspect reinitiated communications with police, the analysis should focus on the totality of the circumstances. Therefore, because Detective Morgen ceased questioning and Leyba then evinced a willingness to discuss the events in question, we conclude that Leyba reinitiated communications with police, thereby revoking his previous request for counsel. No minimum amount of time had to pass before Leyba could do so. ¶26 Finally, we note that our conclusion comports with the purpose of the Edwards rule: Detectives must cease interrogation upon a suspect's invocation of the right to counsel because, "[i]n the absence of such a bright-line prohibition, the authorities through ‘badger[ing]’ or ‘overreaching’—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." Smith , 469 U.S. at 98, 105 S.Ct. 490 (alteration in original) (first quoting Oregon v. Bradshaw , 462 U.S. at 1044, 103 S.Ct. 2830 ; and then quoting Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) ) (explaining the purpose of the rule in Edwards ). Indeed, "[t]he Fifth Amendment protects defendants from improper forms of police interrogation, not from their own impulses to speak." People v. Gonzales, 987 P.2d 239, 243 (Colo. 1999).
¶27 Here, Detective Morgen ceased his questioning and did nothing to "badger" Leyba into waiving his previously invoked right to counsel; he made no effort to entice Leyba into discussing the facts of the case, nor did he respond to Leyba's remarks by asking questions about the investigation. Instead, Detective Morgen's only statements were direct, succinct, and responsive to Leyba's comments. It was not until after Leyba confirmed that he would talk and signed a form waiving his rights that Detective Morgen asked any questions about the events at issue. Thus, Detective Morgen did not engage in the kind of police conduct that the Edwards rule seeks to prevent.
¶28 After Leyba clarified that he would talk and could ask for a lawyer anytime he felt uncomfortable, he read and signed a form waiving his Miranda rights. As the trial court found and the court of appeals concluded, we too conclude that there was no violation of Leyba's Miranda rights.
III. Conclusion
¶29 For the foregoing reasons, we affirm the judgment of the court of appeals.
1 We granted certiorari to review the following issue:
Whether the court of appeals failed to follow this Court's decisions in People v. Redgebol, 184 P.3d 86, 99 (Colo. 2008), and People v. Bradshaw, 156 P.3d 452 (Colo. 2007), where it found that the custodial interrogation of Petitioner ended immediately after he invoked his Fifth Amendment right to counsel, and that his statement complaining about the reasons for custody qualified as a reinitiation of the interrogation.
2 We note that there are two operative cases with the name "Bradshaw." We refer to the Colorado case, People v. Bradshaw, 156 P.3d 452 (Colo. 2007), as "Bradshaw ," and we refer to the U.S. Supreme Court case, Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), as "Oregon v. Bradshaw ."
3 We note that the trial court made no such determination here.
4 To the extent that portions of the discussion of reinitiation in Redgebol could be interpreted as inconsistent with our decision today, we overrule them.